# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| LYDIA COURTNEY-POPE, | * | |
| *Plaintiff*, | * | |
| | * | |
| v. | * | Civil Action No. ELH-16-4055 |
| | * | |
| BOARD OF EDUCATION OF | * | |
| CARROLL COUNTY, | * | |
| *Defendant*. | * | |
| | ********* | |

## MEMORANDUM OPINION

In this employment discrimination case, plaintiff Lydia Courtney-Pope, a self-represented school teacher, filed suit against her former employer, the Board of Education of Carroll County (the "Board"), asserting claims under the Americans with Disabilities Act of 1990, as amended by the ADA Amendments Act of 2008 ("ADA"), 42 U.S.C. § 12101 *et seq.*; the Maryland Fair Employment Practices Act ("FEPA"), Md. Code (2014 Repl. Vol., 2017 Supp.), § 20-601 *et seq.* of the State Government Article ("S.G."); and the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"). In particular, plaintiff alleges that the Board failed to make reasonable accommodations for her disability of post-traumatic stress disorder, in violation of the ADA (Count One); discriminated against her on the basis of her disability, in violation of the ADA (Count Three) and the FEPA (Count Four); interfered with her medical leave, in violation of the FMLA (Count Five); and retaliated against her for taking medical leave, in violation of the FMLA (Count Six). *Id.* at 18-33.[1]

---

[1] In a Memorandum Opinion and Order of January 19, 2018, the Court dismissed Count Two, without prejudice, which alleged a failure to accommodate under S.G. § 20-606(a)(4). *See* ECF 19; ECF 20.

The Board has filed a post-discovery motion for summary judgment (ECF 64), supported by a memorandum of law (ECF 64-1) (collectively, the "Motion") and numerous exhibits. Plaintiff filed a combined opposition to the Motion and a cross motion for summary judgment ("Cross Motion"), along with numerous exhibits. *See* ECF 69.[2] The Board's reply is at ECF 80. Plaintiff's reply is at ECF 86, with additional exhibits.

The motions have been fully briefed, and no hearing is necessary to resolve them. *See* Local Rule 105(6) (D. Md. 2018).[3] For the reasons that follow, I shall grant the Board's Motion in part and deny it in part, and I shall deny plaintiff's Cross-Motion.

## I.     Factual Background[4]

From 2005 to 2014, plaintiff was a chorus and dance teacher at South Carroll High School ("SCHS" or the "School") in Carroll County, Maryland. ECF 74, Ex. 1; ECF 64-10 (Pl.'s July 13, 2018 Dep.) at 6, Tr. 40:15-18. In addition to teaching, plaintiff coordinated twice-yearly choral concerts, participated in festivals, prepared students for choral and dance concerts, and assisted with additional fundraising concerts. ECF 64-10 at 5-6, Tr. 39-40. Plaintiff was well liked by

---

[2] Defendant argues that plaintiff failed to properly support her Cross Motion because she had to re-file 70 disorganized exhibits. ECF 80 at 3 n.5. However, the Court allowed plaintiff to re-file the exhibits. *See* ECF 70; ECF 74; ECF 75. Unfortunately, the exhibits were not filed electronically. Rather, they were filed separately and submitted in binders. ECF 74, ECF 74-1. The Court will refer to the exhibits as "ECF 74, Ex. __".

[3] The docket reflects a flurry of other submissions by the parties, which I need not recount.

[4] The Factual Background is derived from the exhibits submitted by the parties, including various affidavits, hearing transcripts, and deposition transcripts. For the purpose of these motions, the facts are viewed in the light most favorable to the non-moving party. *See Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) (noting that summary judgment is only appropriate if the Court finds no genuine dispute of material fact after "viewing the evidence in the light most favorable to the non-moving party").

I shall generally cite to the pagination as it appears on the court's electronic filing system.

students and parents alike, and received exemplary evaluations and honors from school administrators. ECF 74, Exs. 2, 4, 6.

Plaintiff's employment was governed by a "Master Agreement" between the Board and the Carroll County Education Association. ECF 74, Ex. 36C. School Principal Jeffrey Hopkins and SCHS Assistant Principal Meghan Humbert-Brown[5] were two of plaintiff's supervisors. ECF 74, Ex. 6.

In 2011, plaintiff developed symptoms of post-traumatic stress disorder ("PTSD"). It was due, among other reasons, to certain trauma that she had experienced arising out of marital difficulties. ECF 74, Ex. 43, Pl.'s Affidavit, ¶¶ 5-10; ECF 64-2 (Hopkins Affidavit), ¶ 3 . In or about the summer of 2014, plaintiff was diagnosed with PTSD by her doctor, which constitutes a disability within the meaning of the ADA. *Id.* As a result of her PTSD, plaintiff experienced "hyper-vigilance, … flashbacks, exhaustion due to medication and inability to sleep, sensitivity to sounds and crowds, anxiety (racing heart and feeling of no breath) under stress, conflation of trauma and when under duress, dissociation." ECF 74, Ex. 43.

At the beginning of the 2014 school year, plaintiff informed Brown and Hopkins of her diagnosis and requested several accommodations. ECF 1, ¶ 25; ECF 74, Ex. 43, Plaintiff's Affidavit, ¶¶ 12-16. In her Complaint, plaintiff identifies three accommodations that she requested: (1) to leave at the end of the day, without staying past her contractual leave time; (2) to walk or run on the School's track during her preparation periods to help "decompress"; and (3) to take leave when needed, after proper notification, to attend therapy and counseling sessions to manage and treat her PTSD. ECF 1, ¶ 26; ECF 69 at 10-11.

---

[5] Plaintiff refers to Meghan Humbert-Brown as Ms. "Humbert-Brown." *See*, *e.g.*, ECF 74, Ex. 43 (Aff. of Plaintiff). But defendant notes that Ms. Humbert uses "Brown" as her current last name. ECF 64 at 2 n.1. The Court will refer to her as "Brown."

Plaintiff does not allege that any of those requests were denied. *Id.* However, she asserts that defendant's employees were "cold, insensitive, and callous," and she complains that they never "engage[d] her in an interactive process to [] discuss her disability . . . and how SCHS could accommodate" her. ECF 1, ¶¶ 32-33. Nevertheless, plaintiff notes an "accommodation conversation" she had with Brown on August 25, 2014, "within 5 minutes, after the bell had rung, on the first day of school, in the hallway outside [plaintiff's] classroom, as new students were filing into [her] classroom." ECF 74, Ex. 43.

In September 2014, plaintiff requested twelve weeks of intermittent FMLA leave. ECF 74, Ex. 8. On September 23, 2014, plaintiff notified Brown and Hopkins about her FMLA application. ECF 74, Ex. 9. In plaintiff's FMLA application, her doctor stated that, "due to emotional lability and mood instability, employee may be unable to interact effectively with students or co-workers at times." ECF 74, Ex. 8 at 2. Her doctor also stated that plaintiff "may have trouble maintaining her regular work schedule on occasions as she goes through treatment." *Id.* at 4. On October 1, 2014, plaintiff's FMLA request was approved, permitting plaintiff to take up to sixty days of FMLA leave in the twelve-month period from September 22, 2014 to September 22, 2015. ECF 74, Ex. 12.

In her Affidavit, plaintiff indicates that, at the outset of the school year in August or September 2014, at her "SLO meeting,"[6] she met with Ms. Brown and disclosed her PTSD and its cause. ECF 74, Ex. 43 (Plaintiff's Affidavit), ¶ 12. She requested a waiver of the required professional development projects that caused her further anxiety by requiring her to stay after

---

[6] "SLO" is an abbreviation for "student learning objective." ECF 74, Ex. 43, Mar. 12, 2015 Hearing Tr. at 396-97. Every teacher was required to prepare an SLO, stating his or her own goal and two goals for their students, and to submit the SLO to the supervisor for approval. *Id.* at 397-98. Plaintiff submitted her SLO to Brown on October 2, 2014. ECF 74, Ex. 13. However, plaintiff does not provide the date of the SLO meeting or any additional details about the meeting.

school and give up her preparatory periods. ECF 74, Ex. 43, Plaintiff's Affidavit, ¶¶ 15, 16; *see also* ECF 69 at 9 n.10. Plaintiff avers that she was "over-candid" with Ms. Brown about her PTSD, and Ms. Brown was "uncharacteristically combative." ECF 74, Ex. 43, ¶¶ 14, 15.

Plaintiff claims that, based on Ms. Brown's response, she "appealed" to Hopkins, but he refused plaintiff's request "to waive further professional developments," saying that "'it wouldn't be fair'" to other teachers. *Id.* ¶ 16. In contrast, Hopkins testified that, at the start of the school year, he and plaintiff had "talked" about plaintiff's request for "family medical leave." ECF 64-11 at 22, Tr. 25. And, Hopkins claimed that "there was never an issue of [plaintiff] not being able to take her leave." *Id.* at 21, Tr. 74.

According to plaintiff, beginning in October 2014, she was mistreated as a result of using her FMLA leave. On October 10, 2014, after plaintiff had taken FMLA leave for the day, Brown reported to Hopkins that plaintiff was absent and had failed to leave regular or emergency lesson plans for her substitute, even though plaintiff had indeed left the lesson plans in the classroom and had sent both Brown and another teacher an email with the plans that morning. ECF 74, Ex. 17, Ex. 18; ECF 74, Ex. 43, Administrative Hearing Tr. of Mar. 12, 2015, and Mar. 13, 2015 (hereinafter, "Hearing Tr.") at 403-05; ECF 64-11 (Hearing Tr.) at 107[7]; ECF 64-10 (Pl.'s July 13, 2018 Dep.), at 19-25, Tr. 80-86. Nonetheless, Brown demanded ten extra lesson plans from plaintiff for the days for which she took leave, although other teachers were not required to provide such plans. ECF 74, Ex. 43, Hearing Tr. at 407; ECF 64-10 at 19-25; *see also* ECF 74, Ex. 39B,

---

[7] The Board provided only excerpts of the Administrative Hearing Transcript of March 12 and March 13, 2015, which is docketed at ECF 64-11. And, as noted, plaintiff's submission is in paper format. With respect to plaintiff's citations to the Hearing Transcript, I have endeavored to include the parallel electronic citation, where possible, for the benefit of those with access to the electronic filings.

¶ 5; Ex. 40, ¶ 5 (affidavits from two teachers who attest they were never required to prepare emergency lesson plans, despite absences).

Plaintiff suffered an anxiety attack on October 15, 2014, as a result of her PTSD, triggered by her classroom relocation and a verbal altercation with another employee. ECF 74, Ex. 43, Hearing Tr. at 416-418. Plaintiff asked Brown for a substitute teacher to cover her classes for the rest of the day. *Id.* at 418-19. According to plaintiff, Brown responded, "What do you want me to do, pull a sub out of thin air?" *Id.* at 419. Brown did, however, find a substitute for plaintiff. *Id.* at 420.

On October 20 and 22, 2014, plaintiff used FMLA leave to take full-day absences. ECF 1, ¶ 89. On October 21 and 23, 2014, plaintiff met with Hopkins to discuss the lesson plan issue from October 10 and other matters. ECF 74, Ex. 43, Mar. 12, 2015 Hearing Tr. at 413; ECF 69 at 19; ECF 64 at 9. Plaintiff avers that, during the October 21 meeting, Hopkins yelled at her for not completing the ten additional lesson plans, and refused to listen to her explanations. ECF 74, Ex. 43, Pl.'s Affidavit, ¶ 32. According to plaintiff, during the October 23 meeting, Hopkins again did not listen to her explanations, and refused her accommodations, stating "there is a limit." *Id.* ¶¶ 4, 33.[8] Hopkins sent a letter to plaintiff memorializing these meetings, but plaintiff refused to sign it because of its alleged inaccuracies. ECF 74, Ex. 43, Hearing Tr. at 413; ECF 64-18. On November 17, 2014 and December 1, 2014, plaintiff used only 45 minutes of leave, yet she claims her salary was docked each time for half a day. ECF 1, ¶¶ 90, 91; *see* ECF 74, Ex. 23.

On or about November 14, 2014, Hopkins entered plaintiff's locked office with a substitute teacher while plaintiff was absent. ECF 64-2, ¶ 8; ECF 69 at 19-20; *see also* ECF 74, Ex. 37, ¶¶

---

[8] Plaintiff's Complaint alleged that Hopkins said this on October 15, 2014, but plaintiff corrected this to October 23 in her Affidavit of December 26, 2018. *See* ECF 1, ¶ 80; ECF 74, Ex. 43, Pl.'s Affidavit, ¶ 4.

4-8; Ex. 40, ¶ 24.  He "observed pills laying out in the open on [plaintiff's] desk." ECF 64-2, ¶ 8. Hopkins took the pills to the school nurse, "[k]nowing that [plaintiff's] students were often observed in her office with or without her present." *Id.* The school nurse confirmed the pills were vitamins.  But, Hopkins spoke with plaintiff upon her return "about the importance of not leaving pills in places accessible to students, but [he] never disciplined [plaintiff] regarding this incident." *Id.* In addition, sometime in the beginning of the school year, Hopkins had offered plaintiff an "Employee Assistance Brochure" in response to her "confiding in [him] about her marital problems." *Id.* ¶ 7.

On December 15, 2014, plaintiff met with Hopkins, Human Resources Specialist Kelly Keith, and plaintiff's union representative, Glen Galante.  ECF 64-10 (Pl.'s July 13, 2018 Dep.) at 26-27, Tr. 101-02.  Plaintiff explained that she was joking when she told her students to take a nap, and that the students knew she meant they would be doing a listening exercise. ECF 74, Ex. 43, Hearing Tr. at 436-37; ECF 64-11 at 108.  At the meeting on December 15, 2014, Hopkins raised other allegations about plaintiff's teaching practices, including unsubstantiated grading practices and refusal to teach the required lesson plan during an Advisory period, all of which plaintiff denied. ECF 74, Ex. 43, Hearing Tr. at 435-37.

At the conclusion of the meeting, plaintiff was provided with a letter signed by Board Superintendent Stephen Guthrie, placing her on administrative leave, with pay, pending an investigation, based on reports that plaintiff had instructed students to take a nap in class on December 12, 2014, and because plaintiff had posted inappropriate information on a student's social media page.  ECF 64-10 (Pl.'s July 13, 2018 Dep.) at 27-28, Tr. 102-04[9]; *see also* ECF 64-24 (Guthrie letter).

---

[9] The electronic submission does not include deposition page 103.

Thereafter, Hopkins conducted an investigation into plaintiff's teaching practices. And, he received several additional reports from students. ECF 64-11 at 112-119; ECF 64-25 (student letters).[10]

Plaintiff admits she posted on a pregnant student's social media page, but claims that she did so under the mistaken belief that the student had graduated already. ECF 74, Ex. 43, Hearing Tr. at 438-39. Plaintiff's social media message, written in response to the student's post about being past her due date, stated: "Oh honey! Have a glass of wine and some 'special time' with daddy! If that doesn't work, msg me!" *Id.* at 439-41; ECF 74, Ex. 32 (social media post).

On December 17, 2014, Hopkins wrote a letter to his supervisor, Tom Hill, detailing his findings and requesting that plaintiff be disciplined up to and including termination of employment. ECF 64-26. Hopkins's letter outlined several concerns, including plaintiff giving students unsubstantiated or incomplete grades, telling students to take a nap during class and Advisory period instead of doing the required lesson, telling students she was hungover, and posting inappropriately on a student's social media page. *Id.* The next day, December 18, 2014, Hill wrote a letter to Jimmie Saylor, the Board's Director of Human Resources, recommending plaintiff's termination "on the grounds of misconduct, and repeated inappropriate and unprofessional behavior in the presence of students." ECF 64-27. In turn, Saylor made the same recommendation to the Assistant Superintendent of Administration, Jonathan O'Neal. ECF 64-28.

On December 19, 2014, plaintiff was told that she must either resign or be fired. ECF 1, ¶ 94; ECF 69 at 23. Superintendent Guthrie sent a letter to plaintiff on December 22, 2014,

---

[10] One of the students who heard plaintiff state that she was hungover submitted an affidavit on behalf of plaintiff, attesting that Hopkins pressured her to write a statement, asking for only negative information, and that Hopkins "would not let [her] leave until [she] made a written statement." *See* ECF 74, Ex. 48, ¶¶ 4-8; ECF 64-25 at 14.

recommending her termination from employment for misconduct in office, incompetency, and willful neglect of duty. ECF 64-29; ECF 64-10 (Pl.'s July 13, 2018 Dep.) at 29-30, Tr. 105-06. Plaintiff was also advised of her right to a hearing before the Board. *Id.*

The Board convened a two-day hearing on March 12 and 13, 2015, pursuant to Md. Code (2014 Repl. Vol., 2017 Supp.), § 6-202(a)(3) of the Education Article ("Educ."). *See* ECF 64-11 (Hearing Tr.).[11] Plaintiff appeared with counsel. ECF 64-31 at 53. Nineteen witnesses testified at the hearing, including Brown, Hopkins, Keith, Guthrie, Galante, Saylor, and plaintiff. *Id.* Thereafter, the Hearing Examiner issued a comprehensive opinion recommending plaintiff's termination, based on findings of misconduct, incompetency, and willful neglect of duty. ECF 64-31.

On July 8, 2015, the Board heard oral argument from counsel for the parties. ECF 64-10 (Pl.'s Dep.) at 36-39, Tr. 113-14. In a "Decision" of August 12, 2015 (ECF 64-33), the Board did not agree with the Hearing Examiner that plaintiff was "derelict in her duties with respect to leaving plans for her substitute teacher on October 10, 2014 . . . ." ECF 64-33 at 10. But, in all other respects, the Board unanimously agreed with the Hearing Examiner's findings.

By a vote of three to one, the Board adopted the Superintendent's recommendation to dismiss plaintiff "for misconduct in office, willful neglect of duty, and incompetency." *Id.* at 10. The Fourth Board member concurred in the findings, but dissented as to termination, based on plaintiff's "10-year tenure with CCDS and her acknowledged talents . . . ." ECF 64-33 at 10-11.

On February 3, 2015, plaintiff filed a charge of discrimination with the Maryland Commission on Civil Rights ("MCCR"), which she amended on April 20, 2015. ECF 6-25. The

---

[11] Educ. § 6-202 sets forth the grounds for dismissal of a teacher. *See* § 6202(a). The grounds include incompetency and willful neglect of duty.

charge was also filed with the Equal Employment Opportunity Commission ("EEOC"). *See* ECF 30. On August 11, 2016, the MCCR issued a finding of "No Probable Cause to believe that [defendant] discriminated against [plaintiff] because of her . . . disability." ECF 6-29 at 12. The EEOC adopted the findings of the MCCR on October 26, 2016, and closed its file on the charge. ECF 74, Ex. 11. This suit followed on December 21, 2016. ECF 1.

On January 19, 2018, the Court dismissed Count Two of plaintiff's Complaint, without prejudice, allowing plaintiff to move to amend her Complaint by February 12, 2018. ECF 19 at 8-10. Plaintiff did not do so. Defendant filed an Answer to the Complaint, and the case proceeded to discovery in accordance with the Court's Scheduling Order. *See* ECF 22; ECF 24.

Additional facts are included, *infra*.

## II. Legal Standards

### A. Summary Judgment

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Formica v. Aylor*, 739 F. App'x 745, 754 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017). To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law. *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of *some* alleged

factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).

On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Notably, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (May 17, 2004); *see also Celotex*, 477 U.S. at 322-24. And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587; *accord Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d

625, 628 (4th Cir. 2017); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

When, as here, the parties have filed cross motions for summary judgment, the court must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003). Simply because both parties have filed for summary judgment does not mean that summary judgment to one party or another is necessarily appropriate. "Both motions must be denied if the court finds that there is a genuine issue of material fact. But if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Alan Wright & Arthur Miller, Et Al., Federal Practice & Procedure § 2720, at 336-37 (3d ed. 1998, 2012 Supp.).

In reviewing the parties' submissions, the court is mindful that plaintiff is self-represented. Therefore, her submissions must be liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligations of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

### B. Methods of Proof

In general, *at trial* a plaintiff may establish a discrimination claim through "two avenues of proof." *Thomas v. Delmarva Power & Light Co.*, 715 F. App'x 301, 302 (4th Cir. 2018) (per curiam) (Title VII); *see Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)). At summary judgment, reference to the avenues of proof merely serves to inform a court's evaluation of evidence. *See Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019) (recognizing that a Title VII plaintiff may avoid summary judgment by proceeding under the burden – shifting framework established in *McDonnell Douglas Corp. . . .*"); *Pettis v. Nottoway Cty. Sch. Bd.*, 592 F. App'x 158, 160 (4th Cir. 2014) (stating that a plaintiff asserting racial discrimination "may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas . . . .*").

The plaintiff's first avenue is to offer "'direct or indirect'" evidence of discrimination under "'ordinary principles of proof.'" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997). "To avoid summary judgment" when proceeding under ordinary principles of proof, "'the plaintiff must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a

genuine issue of material fact.'" *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001) (internal citations and quotation marks omitted; alteration in original).

In *Warch v. Ohio Casualty Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006), the Fourth Circuit explained the concept of direct evidence:

> Direct evidence must be "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (en banc) (citation and internal quotation marks omitted). Even if there is a statement that reflects a discriminatory attitude, it must have a nexus with the adverse employment action.

In the absence of direct or indirect evidence of discrimination, the focus shifts to the plaintiff's second avenue of proof—the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Notably, courts have applied the *McDonnell Douglas* proof scheme to a variety of employment statutes, including "appropriate" claims under the ADA, such as a discrimination claim. *Ennis v. National Ass'n of Business and Educational Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995).

The *McDonnell Douglas* proof scheme "is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985). *See, e.g.*, *Young v. United Parcel Serv., Inc.*, ___ U.S., 135 S. Ct. 1338, 1345 (2015) (construing the Pregnancy Discrimination Act). But, there is no direct evidence of discrimination in this case. Therefore, I turn to review the *McDonnell Douglas* proof scheme. It is "a procedural device, designed only to establish an order of proof and production." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted). Under the *McDonnell Douglas* approach, the "ultimate burden of persuasion [at trial] never 'shifts' from the plaintiff," who must prove intentional unlawful discrimination. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n.2 (4th Cir. 1989) (citation omitted).

If the plaintiff chooses to proceed under the *McDonnell Douglas* approach, the plaintiff must first establish a "prima facie case of discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Abilt v. Central Intelligence Agency*, 848 F.3d 305, 315 (4th Cir. 2017). Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff is generally required to show that the employer took adverse action against an applicant "under circumstances which give rise to an inference of unlawful discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

If a plaintiff establishes a prima facie case of unlawful discrimination, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *Hurst v. District of Columbia*, 681 F. App'x 186, 189-90 (4th Cir. 2017) (per curiam). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510-11. The plaintiff must then prove, by a preponderance of evidence, "that the [employer's] proffered reason was not the true reason for the employment decision" and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see also Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516-20; *Adams v. Trs. of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had to prove

'*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).

Conversely, if the defendant does not submit evidence of a legitimate basis for its actions, the factfinder may "infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978). And, if the defendant fails to meet the burden of producing "evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action," then "the court must award judgment to the plaintiff as a matter of law." *St. Mary's Honor Ctr.*, 509 U.S. at 509 (emphasis in original). This is because a legal presumption of intentional discrimination has been established. *Id.* at 510 n.3; *see Burdine*, 450 U.S. at 255 n.8 ("[T]he allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.").

As noted, these two approaches merely establish the common methods by which a plaintiff may prove intentional employment discrimination *at trial*. On summary judgment, these approaches help to guide a court's evaluation of the allegations. *Cf. Pettis*, 592 F. App'x at 160 (stating that a plaintiff asserting racial discrimination "may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas . . . .*"). However, a plaintiff asserting discriminatory treatment "may avoid summary judgment by proceeding under the burden – shifting framework established in *McDonnel Douglas Corp. v. Green . . . .*" *Haynes*, 922 F.3d at, 223 (Title VII).

### III. Discussion

### A. Failure-to-Accommodate (Count One)

Plaintiff alleges that defendant violated the ADA by failing to make reasonable accommodations for her disability of PTSD.

The ADA, 42 U.S.C. §§ 12101 *et seq.*, was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." § 12101(b)(2). To that end, the statute "prohibits discrimination against persons with disabilities in three major areas of public life: employment, under Title I of the ADA, *see* 42 U.S.C. §§ 12111–12117; public services, under Title II, 42 U.S.C. §§ 12131–12165; and public accommodations, under Title III, 42 U.S.C. §§ 12182–12189." *A Helping Hand, LLC v. Balt. Cty., Md.,* 515 F.3d 356, 361 (4th Cir. 2008) (citing *Tennessee v. Lane*, 541 U.S. 509, 516-17 (2004)).[12]

The ADA contains five titles: Title I, Employment; Title II, Public Services; Title III, Public Accommodations; Title IV, Telecommunications; and Title V, Miscellaneous Provisions. Of relevance here, Title I prohibits discrimination "against a qualified individual on the basis of

---

[12] "Modeled after Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* the ADA incorporates that statute's enforcement procedures, *id.* § 12117(a), including the requirement that a plaintiff must exhaust [her] administrative remedies by filing a charge with the EEOC before pursuing a suit in federal court, *see id.* § 2000e–5(b), (f)(1)." *Sydnor v. Fairfax Cnty.*, 681 F.3d 591, 593 (4th Cir. 2012). The administrative claims process is "an integral part" of the enforcement scheme that Congress set out in Title VII. *Chacko v. Patuxent Inst.,* 429 F.3d 505, 510 (4th Cir. 2005). By incorporation, it is also integral to the ADA. *See Sydnor*, 681 F.3d at 593. "Allowing [the EEOC] first crack at these cases respects Congress's intent 'to use administrative conciliation as the primary means of handling claims, thereby encouraging quicker, less formal, and less expensive resolution of disputes.'" *Id.* (quoting *Chris v. Tenet*, 221 F.3d 648, 653 (4th Cir. 2000)).

disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *see Summers v. Altarum Inst., Corp.,* 740 F.3d 325, 328 (4th Cir. 2014) ("The ADA makes it unlawful for covered employers to 'discriminate against a qualified individual on the basis of disability.'").

A disability is defined as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1). *See Gentry v. E. W. Partners Club Mgmt. Co*., 816 F.3d 228, 239 (4th Cir. 2016) (quoting 29 C.F.R. § 1630.2(k)(1)). Major life activities include, but are not limited to, "sleeping, walking, standing, lifting, bending . . . working" and "reproductive functions" *Id.* §12102(2)(A)-(B). An individual with a "a record of such an impairment," or who is "regarded as having such an impairment," will be considered to have a disability. *Id..* § 12102(1)(B)-(C).

A "qualified individual" is defined in the ADA as a person who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see* 29 C.F.R. § 1630.2(m) ("The term 'qualified,' . . . means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position."); *see also Reyazuddin v. Montgomery Cty.*, 789 F.3d 407, 414 (4th Cir. 2015).

To determine whether an individual is qualified, the court "must decide (1) whether she could 'perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue,' and (2) if not, whether "'any reasonable accommodation by the

employer would enable [her] to perform those functions.'" *Tyndall v. Nat'l Educ. Centers, Inc. of California*, 31 F.3d 209, 213 (4th Cir. 1994) (quoting *Chandler v. City of Dallas*, 2 F.3d 1385, 1393-94 (5th Cir. 1993)); *see Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 462 (4th Cir. 2012). "The plaintiff 'bears the burden of demonstrating that [the complainant] could perform the essential functions of her job.'" *E.E.O.C. v. Womble Carlyle Sandridge & Rice, LLP*, 616 F. App'x 588, 593 (4th Cir. 2015) (quoting *Tyndall*, 31 F.3d at 213); *see Halpern*, 669 F.3d at 462.

Under Title I of the ADA, the term "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer.]" *Id.* §12112(b)(5)(A); *see Wilson v. Dollar Gen. Corp.,* 717 F.3d 337, 344 (4th Cir. 2013). Additionally, "[t]he Act prohibits covered employers from discharging qualified employees because they are disabled." *Summers*, 740 F.3d at 328. Moreover, "denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability" may qualify as "discrimination against a qualified individual on the basis of disability." 42 U.S.C § 12112(b)(5)(B).

As noted, "[o]ne form of discrimination prohibited by the ADA is a failure to make a reasonable accommodation." *Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314, 322 (4th Cir. 2011). A reasonable accommodation is one that (1) 'enables [a qualified] individual with a disability . . . to perform the essential functions of [a] position,' 29 C.F.R. § 1630.2(o)(1)(ii); or (2) 'enable[s] [an] employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by . . . other similarly situated employees without disabilities.'" *Hamel v. Bd. of Educ. of Harford Cty.*, JKB-16-2876, 2018 WL 1453335, at *10 (D. Md. Mar. 23, 2018) (citing 29 C.F.R. § 1630.2(o)(1)(iii)). However, an accommodation is not

reasonable as a matter of law "if it either imposes undue financial and administrative burdens on a grantee, or requires a fundamental alteration in the nature of [the] program." *Sch. Bd. of Nassau Cty., Fla. v. Arline*, 480 U.S. 273, 288 (1987) (internal citations omitted); *see Reyazuddin*, 789 F.3d at 414; *Halpern*, 669 F.3d at, 464. The concept of reasonable accommodation is discussed in more detail, *infra*.

A plaintiff has a "record of disability" if she can show that she "'has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." *Foore v. Richmond*, 6 F. App'x 148, 153 (4th Cir. 2001) (quoting 29 C.F.R. § 1630.2(k)(1)). The question of whether a plaintiff is disabled or has a record of disability under the ADA is "'a question of law for the court.'" *Coghill v. Bd. of Educ. of Prince George's Cty.*, GJH-14-2767, 2017 WL 1049470, at *5 (D. Md. Mar. 17, 2017) (quoting *Rose v. Home Depot U.S.A., Inc.*, 186 F. Supp. 2d 595. 608 (D. Md. 2002)), *aff'd*, 703 F. App'x 211 (4th Cir. 2017). To resolve this question, the court must make an "an individualized inquiry, particular to the facts of each case." *E.E.O.C. v. Sara Lee Corp.*, 237 F.3d 349, 352 (4th Cir. 2001). "[T]he date of an adverse employment decision is the relevant date for determining whether a plaintiff is a "qualified individual with a disability." *E.E.O.C. v. Stowe-Pharr Mills, Inc.*, 216 F.3d 373, 379 (4th Cir. 2000).

In order to establish a prima facie claim of failure to accommodate, plaintiff must show: "(1) that [she] was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [she] could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." *Jacobs*, 780 F.3d at 579 (alterations in original) (quoting *Dollar Gen. Corp.*, 717 F.3d at 345); *see Rhoads*, 257 F.3d at 387 n.11; *see also Stephenson v. Pfizer*, 641 F. App'x

214, 219 (4th Cir. 2016) (per curiam). As a necessary corollary of the fourth requirement, the plaintiff must have communicated to her employer "a wish for accommodation of her disability." *Parkinson v. Anne Arundel Medical Ctr.*, 79 F. App'x 602, 604 (4th Cir. 2003).

The applicable federal regulations provide, in part: "To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3). The so called "interactive process" should "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id.*; *see also Haneke v. Mid-Atl. Capital Mgmt.*, 131 F. App'x 399, 399-400 (4th Cir. 2005) ("Implicit in the fourth element [of the prima facie case] is the ADA requirement that the employer and employee engage in an interactive process to identify a reasonable accommodation").

The responsibility to engage in the interactive process is "*shared* between the employee and the employer." *Loulseged v. Akzo Nobel, Inc.*, 178 F.3d 731, 736 (5th Cir. 1991) (emphasis in *Loulseged*). "A party that obstructs or delays the interactive process, or simply fails to communicate, is not acting in good faith to find a solution." *Fleetwood v. Harford Systems, Inc.*, 380 F. Supp. 2d 688, 701 (D. Md. 2005). Moreover, "the employer must work with the employee to determine what accommodation would help," and the employer "cannot escape liability simply because the employee does not suggest a particular reasonable accommodation that would assist him." *Id.* In the same vein, the employee "cannot prevail simply by demonstrating that his employer failed to engage in the interactive process; he must also show that this failure to engage in the process resulted in the failure to find an appropriate accommodation." *Id.*

The plaintiff bears the "burden of identifying an accommodation that would allow a qualified individual to perform the job," as well as "the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable." *Lamb v. Qualex, Inc.*, 33 F. App'x 49, 59 (4th Cir. 2002). Notably, "at the summary judgment stage, the employee 'need only show that an accommodation" seems reasonable on its face'. . . ." *Reyazudding.*, 789 F.3d at 414 (some quotations and citation omitted); *see US Airways, Inc. v. Barnett*, 535 U.S. 391, 401-02 (2002). Once the plaintiff has met [her] burden of proving that reasonable accommodations exist, the employer may present evidence that the plaintiff's requested accommodation imposes an undue hardship on the employer." *Lamb*, 33 F. App'x at 59. Notably, "'[a]n employer is not obligated to provide an employee with the accommodation he or she requests or prefers; the employer need only provide some reasonable accommodation.'" *Crawford v. Union Carbide Corp.*, No. 98-2448, 1999 WL 1142346, *4 (4th Cir. Dec. 14, 1999) (citation omitted), *cert. denied*, 530 U.S. 1234 (2000).

The Board acknowledges that plaintiff has satisfied the first three elements of her failure-to-accommodate claim. But, defendant contends that plaintiff cannot satisfy the fourth element: that she was denied a reasonable accommodation. ECF 64 at 24. According to defendant, plaintiff was provided every accommodation that she requested. *Id.*

As noted in this Court's Memorandum Opinion of January 19, 2018 (ECF 19), addressing the Board's motion to dismiss (ECF 6), plaintiff did not clearly identify in her Complaint any specific accommodation that she requested and was denied. ECF 19 at 17; ECF 1. In her Cross Motion, however, plaintiff posits that she requested additional accommodations on two separate occasions: at her SLO meeting with Brown in August or September of 2014, and later with

Hopkins.  ECF 69 at 9 n.10; ECF 74, Ex. 43, Pl.'s Affidavit, ¶¶ 14-16. According to plaintiff, the Board did not allow the waiver of professional development requirements. *Id.*

Plaintiff attests that she requested from both Brown and Hopkins a waiver of the required professional development hours, because the requirement caused plaintiff to stay after school, triggering anxiety as a result of her PTSD. ECF 74, Ex. 43, Pl.'s Affidavit, ¶¶ 15-16. Further, she avers that she made this request to Brown after the "hallway accommodations" conversation on August 25, 2014. *Id.* ¶ 15. Plaintiff could not recall the exact date of the meeting with Brown, but "know[s] that it was in September," and that Brown "told [plaintiff] to leave," without approving the request. *Id.* ¶ 14. Immediately thereafter, plaintiff approached Hopkins to appeal Brown's refusal to waive further professional development requirements.  Hopkins allegedly responded that it "wouldn't be fair" to the other teachers to grant plaintiff's request. *Id.* ¶ 16.

The Board does not dispute these facts in its Motion or reply. *See* ECF 64; ECF 64-2; ECF 64-3; ECF 80.  Rather, the Board simply states, without adequate support, that it accommodated all of plaintiff's requests. ECF 64 at 24-25.  Therefore, the Board is not entitled to summary judgment as to Count One.

On the other hand, summary judgment is also inappropriate in favor of plaintiff.  Although plaintiff states that Brown and Hopkins rejected her professional development request, the record does not reflect whether she was, in fact, required to perform those extra hours or whether defendant ultimately accommodated her request.

Plaintiff provides an email of October 21, 2014, sent from her union representative, Glen Galante, to a group of teachers, about the professional development requirement. ECF 74, Ex. 28A. Galante said: "The bottom line is you only have to work on [professional development] during the time that is allocated to you. You are not expected to work beyond those hours…I suggest you

deal with the individual issues as they arise. If you have an issue you need to go talk to Mr. Hopkins and discuss the solutions." *Id.*

However, it is not clear whether plaintiff sorted this out with Hopkins. For his part, Hopkins testified that "there was never an issue of [plaintiff] not being able to take her leave. She and I had talked about the situation. I was aware of why she needed it. I understood why she needed it . . . I gave her guidance and advice on the employee assistance program and said that that's something that she should look into." ECF 64-11 at 21, Tr. 74.

Plaintiff also states that she "repeatedly attempted to re-engage" Brown and Hopkins after her SLO meeting, and by email on more than one occasion. ECF 69 at 28 (citing ECF 74, Exs. 9, 10). The emails, however, do not establish that defendant did not accommodate plaintiff's request. In fact, the emails do not contain any requests, but seem to serve as reminders that did not warrant responses.

The first email, addressed to both Hopkins and Brown, dated September 24, 2014, stated, ECF 74, Ex. 9:

> Please note that the paperwork has just gone in today, but you should know that I have put in and expect to receive FLMA status for mental health issue: Post Traumatic Stress Disorder. This is a real thing…
> Basically, I will just be able to take my sick days whenever I need them without much explanation. Also, there are group activities which make me uncomfortable at this point, which I will not participate in this year. You can anticipate that I will just excuse myself quietly if I need to leave. If I need to leave during school hours/classes, I will make sure my class is covered before I go.

The second email, addressed to Brown and dated September 28, 2014, stated, ECF 74, Ex. 10:

> We were able to get a therapy appt tomorrow with a really good specialist in EFT. It is at 3 pm in Towson, so I will need to leave early, but probably won't need 3rd mod even though I had to take a half day. I just wanted to give you a courtesy heads up in case you got stuck and needed someone for 3rd mod. Thanks for understanding…

Among other things, plaintiff has not shown that defendant failed to provide an appropriate accommodation. *See Fleetwood*, 380 F. Supp. 2d at 701 ("[A]n employee cannot prevail simply by demonstrating that his employer failed to engage in the interactive process; he must also show that this failure to engage in the process resulted in the failure to find an appropriate accommodation."). As I see it, a genuine dispute of material fact exists about whether both parties met their respective burdens of engaging in good faith in the interactive process.

The record suggests that the communication between the parties about the professional development requirement was deficient on both sides. *See Fleetwood*, 380 F. Supp. 2d at 702 (denying summary judgment when the "record highlight[ed] deficiencies in communication on both sides of this dispute"); *Wilson v. Bd. of Educ. of Prince George's Cty*, No. 12-cv-2092-AW, 2013 WL 3146935, at *4-7 (D. Md. June 18, 2013) ("While [employee's] failure to follow the proper administrative procedure and failure to follow up … may constitute a 'deficiency in communication,' the Court cannot say, as a matter of law, that [employee] failed to engage in an interactive process with his employer.") (citing *Fleetwood*, 380 F. Supp. 2d at 702).

In sum, the Court cannot say, as a matter of law, that either party met the burden to engage in the interactive process in good faith to find an accommodation for plaintiff. Moreover, on this record, I cannot resolve the parties' dispute as to whether the Board permitted the requested accommodation as to waiver of professional development requirements.

### B. Discrimination (Counts Three and Four)

Plaintiff alleges that defendant discriminated against her under the ADA and the Maryland Fair Employment Practices Act, by terminating her employment. The MFEPA is the State law analogue to the federal employment discrimination statutes, and Maryland courts 'traditionally seek guidance from federal cases in interpreting [it].'" *Eubanks v. Mercy Medical Center, Inc.*,

Civil No.: WDQ-15-513, 2015 WL 9255326, at *7 (D. Md. Dec. 17, 2015) (quoting *Haas v. Lockheed Martin Corp.*, 396 Md. 469, 481 (914 A.2d 735, 742 (Md. 2007) (construing former Article 49B). Accordingly, the Court will analyze the MFEPA claim under the ADA standard.

To establish a prima facie case of wrongful discharge under the ADA, a plaintiff must show that (1) she is within the ADA's protected class; (2) she was discharged; (3) at the time of her discharge, she was performing the job at a level that met her employer's legitimate expectations; and (4) her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. *Coursey v. Univ. of Maryland E. Shore*, 577 F. App'x 167, 174 (4th Cir. 2014); *Hoyle*, 650 F.3d at 336; *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 702 (4th Cir. 2001); *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 686 (4th Cir. 1997); *Doe v. University of Maryland Med. Sys. Corp.*, 50 F.3d 1261, 1264-65 (4th Cir. 1995); *cf. Haynes*, 922 F.3d at 223 (stating elements of a prima facie claim for discriminatory termination under Title VII).

The plaintiff bears the burden of proving her claim at trial by a preponderance of the evidence. As to these claims, the alternative avenues of proof of intentional discrimination would apply, as discussed earlier.

Under the *McDonnell Douglas* framework, discussed earlier, the plaintiff has the initial burden of proving a prima facie case of discrimination by a preponderance of the evidence. If the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory explanation which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. If the defendant meets this burden of production, the presumption created by the prima facie case "drops out of the picture," and the plaintiff bears the ultimate burden of proving that she has been the victim of intentional discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. at 511.

In the ADA unlawful discharge context, "[t]he [*McDonnell Douglas*] paradigm is merely a means to fine-tune the presentation of proof and, more importantly, to sharpen the focus on the ultimate question—whether the plaintiff successfully demonstrated that the defendant intentionally discriminated against her." *Ennis v. Nat'l Ass'n of Bus. and Educational Radio, Inc.*, 53 F. 3d 55, 59 (4th Cir. 1995).

Defendant takes issue with the third and fourth elements of plaintiff's case, arguing that plaintiff was not fulfilling the legitimate expectations of her job at the time of discharge, and that the record is devoid of any facts that raise a reasonable inference of unlawful discrimination as to plaintiff's discharge. ECF 64 at 26-27. In response, plaintiff relies on the Board's decision that plaintiff "has had good evaluations, has talent as a teacher, is well-liked by most of her students, and has volunteered her time and talent to student musical performances and competitions outside of those required by her job responsibilities." ECF 69 at 32 (quoting ECF 64-33 at 2). Plaintiff also argues: "Testimony showed that the misconduct in office was based upon her response to the Loudermill hearing, and that claims that Plaintiff was not performing her essential functions were just … lies." *Id.* at 33 n.40. However, plaintiff does not cite to any testimony in the record to support this claim.

I shall assume, *arguendo*, that plaintiff has established a prima facie case under the *McDonnell Douglas* proof scheme. The question, then, is whether the Board has satisfied its burden under the second step. If so, the focus would shift to the third step under *McDonnell Douglas*: Whether plaintiff has presented a basis on which a factfinder could conclude that the Board's proffered, legitimate reason for termination was a pretext for discrimination. In other words, plaintiff must show that "the reason was false, and that discrimination was the real reason." *Jiminez*, 57 F. 3d at 378 (internal citation omitted).

The Board relied on three principal concerns as to plaintiff's conduct, warranting termination: 1) classroom instruction; 2) grading practices; and 3) professional boundaries. ECF 64-33 at 2-7. The record establishes that plaintiff's termination was supported by legitimate concerns about her conduct as a teacher, and not based on her protected status as an individual with a disability. *See* ECF 64-33 (Board Decision); ECF 74, Ex. 43, Hearing Tr. at 438-41 (plaintiff's testimony regarding social media post); *id.* at 365-66, 526 (plaintiff's testimony about advisory lesson plan); *id.* at 383, 454-61 (plaintiff's testimony about grading practices); *id.* at 427-31 (plaintiff's testimony about "hangover"); *id.* at 436 (plaintiff's testimony about students taking a "nap"); *see also* ECF 74, Ex. 32 (social media post).

As to instruction, the Board noted that plaintiff instructed her students to take "naps" while listening to music, and plaintiff refused to teach the required advisory lesson plan on skin cancer. *Id.* at 2-4. As to grading practices, the Board noted plaintiff's unsubstantiated grades for certain students, and lack of a reliable grading system documenting when and why she deducted points from students' overall grades. *Id.* at 4-6. And, as to professional boundaries, the Board noted plaintiff's "joking" with two of her students about being hungover, in addition to plaintiff's social media message to a then-current pregnant student, stating, "Oh honey! Have a glass of wine and some 'special time' with daddy! If that doesn't work, msg me!" *Id.* 6-7; *see* ECF 74, Ex. 32 (social media post).

Notably, plaintiff's own testimony at the hearing corroborated each of these occurrences. *See* ECF 74, Ex. 43, Hearing Tr. She testified that the advisory lesson plans were "stupid," because they were "repetitive," not "relevant," and "not rigorous . . . ." *Id.* at 365-66. When she could not get the projector to work to show the video on skin cancer, she decided not to teach the entire lesson, but "touched on it" by saying "the sun was brighter now than it was when [she] was a girl

and that protection with SPF was important," and "that was pretty much it." *Id.* at 526. When she was tired in class one day, she stated, "Today we're – today since everyone is sick and I am so tired. I can't do anything today. I'm going to take a nap. We're going to take a 'nap' together." *Id.* at 436 (quotation marks omitted). However, she claimed that the statement was a joke, and that she really meant the students were going to do a listening exercise. *Id.*

Plaintiff also testified that she told her students, "I'm not going to be responsible for telling you every time I take a point off your grade." *Id.* at 383. At the hearing, plaintiff was unable to explain what certain markings in her grade book meant, and was unable to give a clear answer for which dates certain grades were intended. *Id.* at 458-61; *see id.* at 460 ("**Q**: And then there's nothing under 8/29; is that correct? **A**: Right. Because this is just a sheet where I'm keeping – **Q**: All sorts of things? **A**: Yeah. **Q**: On 9/2, what are those checkmarks all about? **A**: 9/2 was attendance, but it wasn't attendance for that day. **Q**: It was attendance for a different day? **A**: Sure. **Q**: What day was it attendance for? **A**: I have no idea . . . I have my own system.").

Moreover, plaintiff testified that she told two students that she was hungover, in a joking fashion. *Id.* at 430 ("And I said, 'Oh, you, too, are hung over, Karleigh?' And then I said, 'Just kidding. Miss Courtney's not hung over. I do not advocate the use of alcohol with my students.'"). Plaintiff also admitted that she posted on a pregnant student's social media page, but that she did so under the mistaken belief that the student had graduated already. *Id.* at 438-41.

Courtney-Pope did not make any reference to her PTSD when explaining the incidents. Nor did she suggest that her PTSD contributed to her behavior. *See* ECF 74, Ex. 43, Hearing Tr. at 365, 383, 436, 430, 438-41, 458-61, 526. Nevertheless, plaintiff maintains that she should have been given the "benefit of the doubt" because of her PTSD, and because she had good evaluations and was well liked by her students. ECF 69 at 32-33. This argument, however, does not establish

that plaintiff was performing her job at a level that met her employer's legitimate expectations. Nor does it show that her termination was the product of discriminatory animus.

In *Ennis*, 53 F.3d at 62, the Fourth Circuit reversed a district court's denial of summary judgment on a wrongful discharge claim because "the evidence of [the employee's] poor performance was so substantial and persuasive that no reasonable jury could find by a preponderance of the evidence that she was performing her job adequately." In *Ennis*, the plaintiff-employee exhibited excessive socializing, taking personal phone calls at work, inaccuracies in her data entries, and lateness. *Id.* at 61.

The record in this case presents similar behavioral issues by plaintiff, such that no reasonable jury could find by a preponderance of the evidence that plaintiff was adequately performing her job as a teacher when she joked about being hungover with her students, could not maintain a reliable grading system, and posted on an underage student's public social media page about drinking alcohol. *See Wyatt v. Maryland Inst.*, Civil Action No. RDB-10-2584, 2012 WL 739096, at *9 (D. Md. Mar. 7, 2012) ("In this case, while both parties agree that [employee's] performance on the job was satisfactory, [employer] has demonstrated that [employee] failed to satisfy one of its significant legitimate expectations" when employee failed to report for a shift and secure a replacement).

Significantly, there is nothing in the record to suggest that plaintiff's termination arose because of unlawful discrimination linked to her disability. To establish this element, plaintiff must present "affirmative evidence that disability was a determining factor in the employer's decision." *Ennis*, 53 F.3d at 59. In evaluating the fourth element of an ADA wrongful discharge claim, the Fourth Circuit "accept[s] the *McDonnell Douglas* [burden-shifting] framework as a useful tool,"

but recognizes that "it should not be applied in a 'rigid, mechanized, or ritualistic manner.'" *Id.* (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

The facts on summary judgment are construed in favor of the nonmovant. But, the facts here demonstrate unequivocally that the discharge was not the product of discrimination on the basis of disability. The Board's termination decision was explicitly based on the incidents described above. It found that plaintiff "wasted instructional time," ECF 64-33 at 4; "could not explain" her grading, *id.* at 5; and crossed "professional boundaries," *id.* at 6, demonstrating "extremely poor judgment . . . ." *Id.*

The Board also found willful neglect of duty, misconduct in office, and incompetence. *Id.* at 7-9. For example, it determined that plaintiff demonstrated "an intentional 'disregarded [sic] [of] a manifest duty,' a 'dereliction from duty,' and a 'fail[ure] [by plaintiff] to adequately perform the duties of [her] assigned position.'" *Id.* at 9.

Of import here, "unsupported speculation" cannot establish a discrimination claim. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996); *see Duffy v. Belk, Inc.*, 477 F. App'x 91, 94-98 (4th Cir. 2012) (ADEA case). Without any connection between the circumstances of plaintiff's termination and her disability, the trier of fact would have to speculate that the Board terminated plaintiff because all of the incidents resulted from plaintiff's PTSD. *See Ennis*, 53 F.3d at 62 ("The building of one inference upon another will not create a genuine issue of material fact. Mere unsupported speculation, such as this, is not enough to defeat a summary judgment motion.") (citing *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985) (internal citation omitted).

Plaintiff attempts to establish pretext for discrimination by arguing disparate treatment when "similarly situated employee Wade Kemper had literally kissed a student, and was allowed

to resign, the year prior." ECF 69 at 35. "Disparate treatment occurs when an employer treats some people less favorably than others because of a protected characteristic (e.g., disability)." *Bennett v. Kaiser Permanente*, 931 F. Supp. 2d 697, 707-08 (D. Md. 2013) (citing *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003)).

Plaintiff must demonstrate that the comparator was "similarly situated" in all relevant aspects. *Sawyers v. United Parcel Serv.*, 946 F. Supp. 2d 432, 442 n. 10 (D. Md. 2013), *aff'd*, 576 F. App'x 199 (4th Cir. 2014). "Such a showing would include evidence that the employees 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

Of course, the comparison "'will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same set of circumstances.'" *Haynes*, 922 F.3d at 223-24 (citation omitted); *see Irani v. Palmetto Health*, 767 Fed. App'x 399, 420 (4th Cir. 2019) (per curiam). Nevertheless, "[i]f a plaintiff wishes to prove that a defendant's legitimate, non-discriminatory explanation is pretext by pointing to other employees who were treated differently, '[t]he similarity between comparators … must be clearly established in order to be meaningful.'" *Farrelly v. Acme Markets, Inc.*, Civil Action No. CCB-08-1992, 2011 WL 778583, at *7 (D. Md. Feb. 10, 2011) (quoting *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008)).

Here, plaintiff has provided a news article about Kemper's sex offense charges, testimony by Hopkins about Kemper's situation, and a letter from defendant's attorney identifying Kemper as a former employee who resigned on August 23, 2013, in lieu of termination. ECF 74, Ex. 56.

Plaintiff's comparison is insufficient, however, because she has not clearly established how she is similarly situated to Kemper. *See Lightner*, 545 F.3d at 265.

For example, the record shows only that Kemper was a high school English teacher from 2005 until 2013, and that he resigned in lieu of termination because he kissed a student. *See* ECF 74, Ex. 56. Plaintiff does not provide any other basis for the comparison, such as Kemper's disciplinary history or the circumstances of Kemper's resignation. In any event, even if plaintiff were similarly situated to Kemper, plaintiff has failed to show that she adequately met the legitimate expectations of her employment, and summary judgment is appropriate on that ground alone.

In sum, plaintiff simply has not presented any evidence for a rational trier of fact to infer unlawful discrimination based on her disability at the time of her discharge. Accordingly, the Board is entitled to summary judgment with respect to Counts Three and Four.

### C. FMLA (Counts Five and Six)

Plaintiff alleges that defendant interfered with and retaliated against plaintiff with regard to her entitlement to benefits under the Family and Medical Leave Act of 1993. Under the FMLA, certain employees may take a total of "12 work weeks of leave" during a twelve-month period due to a "serious health condition" that makes the employee "unable to perform the functions of" her job. 29 U.S.C. § 2612(a)(1)(D). In addition, the FMLA "contains *proscriptive* provisions that protect employees from discrimination or retaliation for exercising their substantive rights under the FMLA." *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 546 (4th Cir. 2006) (emphasis in original).

To that end, the FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C.

§ 2615(a)(1). "While the FMLA does not specifically forbid discharging an employee in retaliation for his use of FMLA leave, 29 C.F.R. § 825.220(c) states that employers are 'prohibited from discriminating against employees or prospective employees who have used FMLA leave' and that 'employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions, or disciplinary actions.'" *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 294-95 (4th Cir. 2009); *see also, e.g.*, *Greene v. YRC, Inc.*, 987 F. Supp. 2d 644, 655 (D. Md. 2013).

### 1. Interference (Count Five)

To establish unlawful interference under the FMLA, plaintiff must show: (1) she was an eligible employee; (2) her employer was covered by the statute; (3) she was entitled to leave under the FMLA; (4) she gave her employer adequate notice of her intention to take leave; and (5) the employer denied her FMLA benefits to which she was entitled. *Sherif v. Univ. of Maryland Med. Ctr.*, 127 F. Supp. 3d 470, 477 (D. Md. 2015) (quoting *Wonasue v. Univ. of Maryland Alumni Ass'n*, 984 F. Supp. 2d 480, 495 (D. Md. 2013) (quotation marks omitted)). In addition to refusing FMLA leave, interference includes "discouraging an employee from using such leave." 29 C.F.R. § 825.220(b).

It is undisputed that plaintiff was granted FMLA leave for the full twelve weeks over the period of September 22, 2014, to September 22, 2015. ECF 74, Ex. 12. Plaintiff premises her interference argument on the following allegations: "The failure of Principals to respond to her emails; The failure of Human Resources to [e]ngage as they did with Robin Szymanski; The change in dynamic by [Brown's] and Mr. Hopkins demeanor; The refusal of her supervisors to engage with her to discuss further or changed accommodations; The conspicuous absence of Fine Arts Chairperson Jeffrey Rogers []; her realization of the falsehoods told by [Brown] about her on Oct. 10; the harassment by her Supervisors from October 10-24 in close proximity to their receipt

of the FMLA paperwork; and the clearly pre-textual 'vitamin caper' of Mr. Hopkins." ECF 69 at 37.

Further, plaintiff alleges that on or about September 29, 2014, November 17, 2014, and December 1, 2014, her salary was docked for half a day when she used 45 minutes of FMLA leave. ECF 1, ¶¶ 49, 90, 91. She also complains that, on September 30, 2014, she had to conduct a parent-teacher conference over the phone due to her PTSD symptoms, and Brown docked her salary for half a day. *Id.* ¶ 50.  In addition, she points to Brown's negative attitude and comments about getting a substitute for plaintiff and requiring emergency lesson plans when plaintiff took FMLA leave (ECF 1 ¶ 58-85; ECF 69 at 37), and Hopkins' "exasperated" response to plaintiff's need to take FMLA leave when she had an anxiety attack (ECF 1, ¶ 80). Plaintiff states: "The associated anxiety this created for [plaintiff] made sleeping, thinking, emotional reactivity and interaction more difficult for [plaintiff] and caused an increase, rather than a decrease, in time needed, which she now reasonably inferred was not safe to take." ECF 69 at 37.

Plaintiff must also show that defendant's denial of leave prejudiced her in some way.  *Id. Anderson v. Discovery Commc'ns, LLC*, 517 F. App'x 190, 197-98 (4th Cir. 2013). Prejudice can be proven by showing that plaintiff lost compensation or benefits, sustained other monetary losses, or suffered some loss in employment status. *Ranade v. BT Americas, Inc.*, 581 F. App'x 182, 185 (4th Cir. 2014).  She maintains that she was prejudiced by defendant's discouragement of taking future leave, and her termination from employment. *Id.*; ECF 1 ¶¶ 179.

The Board contends that plaintiff's allegations, viewed in the light most favorable to plaintiff, do not rise to the level of interference with her FMLA benefits.

Defendant argues that docking plaintiff's pay did not constitute interference because federal regulations provide that, "[i]f an employee does not choose to substitute accrued paid leave,

the employer may require the employee to substitute accrued paid leave for unpaid FMLA leave," which "means that the paid leave provided by the employer, and accrued pursuant to established policies of the employer, will run concurrently with the unpaid FMLA leave." 29 C.F.R. § 825.207(a); *see* ECF 74 at 30. The Board also states: "The undisputed facts show that Plaintiff was never docked pay but instead was merely docked accrued leave, which is permissible under the FMLA." ECF 74 at 30.

In support, the Board cites only the federal regulation, but does not provide any facts in the record to support its claim. Defendant also fails to address the notice requirement of the federal regulations, which provides: "If the employer requires paid leave to be substituted for unpaid FMLA leave … the employer must inform the employee of this designation at the time of designating the FMLA leave." *See* 29 C.F.R. § 825.300(d)(1). Failure to provide such notice to an employee "may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights." *Id.* § 825.300(e).

Plaintiff's absence report reflects that on September 29, 2014, November 17, 2014, and December 1, 2014, she was absent, and her classes were assigned to substitutes. ECF 74, Exs. 23, 23A; ECF 64-15. There is no entry for September 30, 2014. As noted, plaintiff alleges that when she took 45 minutes of FMLA leave, Brown docked her salary for half a day. ECF 1, ¶¶ 49, 90, 91. Plaintiff does not state whether Brown informed plaintiff that accrued paid leave would be substituted for FMLA leave. In addition, plaintiff's absence report does not indicate what type of leave plaintiff took on several of the specified dates. *See* ECF 74, Exs. 23, 23A; ECF 64-15. Brown, who was responsible for teacher substitutes, testified that she used the School's "SubFinder system to make sure that faculty members who have called out in the morning for whatever reason, illness, personal business, professional activity, that a substitute has filled that job," and that plaintiff did

so on several occasions when she was absent. ECF 64-11 at 23-32. Brown does not otherwise explain the process of plaintiff's use of her FMLA leave. *See id.*

The Court must construe the facts in the light most favorable to plaintiff. Therefore, the Court cannot say, as a matter of law, that defendant did not interfere with plaintiff's FMLA leave when it substituted her accrued paid leave for her unpaid FMLA leave. If defendant did so without informing plaintiff, a reasonable jury could infer that defendant denied plaintiff the exercise of her FMLA rights. *See, e.g.*, *Anusie-Howard v. Todd*, Civil No. WDQ-12-199, 2015 WL 857360, at *4 (D. Md. Feb. 26, 2015) (granting summary judgment for defendants on FMLA interference claim "[b]ecause the Defendants were entitled to require [plaintiff] to use paid leave first, *see* 29 C.F.R. § 825.207(a), and *provided notice of their intent to do so, see id. § 825.300(e)*" (emphasis added)). Moreover, this action would also serve to establish the requisite prejudice against plaintiff, because it would constitute lost compensation or benefits. *See Ranade*, 581 F. App'x at 185.

Plaintiff's additional allegations surrounding her treatment by Brown and Hopkins when she took FMLA leave are problematic. Plaintiff has not shown the requisite prejudice based on those facts. As indicated, plaintiff must establish that defendant's denial of leave "prejudiced [her] in some way," which can be done by showing that plaintiff lost compensation or benefits, sustained other monetary losses, or suffered some loss in employment status. *See Anderson,* 517 F. App'x at 197-98; *Ranade*, 581 F. App'x at 185. To the extent that plaintiff relies on her termination to show prejudice, defendant has provided legitimate reasons for her termination, unrelated to her FMLA status. *See* ECF 64-33 (Board Decision); ECF 74, Ex. 43, Hearing Tr. at 438-41 (plaintiff's testimony regarding social media post); *id.* at 365-66, 526 (plaintiff's testimony about advisory lesson plans); *id.* at 383, 454-61 (plaintiff's testimony about grading practices); *id.* at 427-31 (plaintiff's testimony about "hangover"); *id.* at 436 (plaintiff's testimony about students taking a

"nap"); *see also* ECF 74, Ex. 32 (social media post). And, "interference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct." *Greene v. YRC, Inc.*, 987 F. Supp. 2d 644, 655 (D. Md. 2013).

Even if the treatment of plaintiff rose to the level of "discouraging" her from using her FMLA leave, because plaintiff does not offer any other basis for prejudice, she cannot meet her burden to establish FMLA interference based on these facts alone.[13] *See Mercer v. Arc of Prince George's Cty,* 532 F. App'x 392, 396 (4th Cir. 2013) (affirming summary judgment for employer on FMLA interference claim when employer "provided evidence that it would have terminated [employee] for poor performance regardless of her FMLA leave, and [employee] has not presented evidence that would allow a jury to conclude otherwise"); *Ward v. Columbia Bank*, CCB-16-3606, 2018 WL 690883, at *6 (D. Md. Feb. 2, 2018) (granting summary judgment to employer on FMLA interference claim because employee could not show prejudice); *Avant v. Southern Maryland Hosp., Inc.*, No. GJH-13-02989, 2015 WL 435011, at *11 (Feb. 2, 2015) (granting summary judgment for employer because "it is not enough that [employer] simply interfered with [employee's] ability to exercise her FMLA rights. To support a viable interference claim, [employee] is still required to show that the [employer's] interference with her FMLA rights somehow prejudiced her," and employee did not contend that the interference caused her to incur any additional expenses or otherwise caused her any harm or loss).

---

[13] Plaintiff's allegation of defendant's different treatment of Robin Szymanski is more properly addressed under the FMLA retaliation claim. Although interference and retaliation claims are similar, "an interference claim alleges that the employer failed to provide a substantive right, regardless of the fact of whether other employees were treated more or less favorably." *Edusei v. Adventist Healthcare, Inc.*, Civil Action DKC 13-0157, 2014 WL 3345051, at *6 (D. Md. July 7, 2014).

Regardless, plaintiff has raised a genuine dispute of material fact as to whether defendant interfered with her FMLA leave when it substituted accrued paid leave for FMLA leave. Thus, summary judgment is inappropriate on Count Five.

## 2. Retaliation (Count Six)

The distinction between an interference claim and a retaliation claim under the FMLA "is not always clear." *Edusei v. Adventist Healthcare, Inc.*, Civ. No. DKC-13-0157, 2017 WL 3345051, at *6 (D. Md. July 7, 2014). "'[T]he interference claim merely requires proof that the employer denied the employee [her] entitlements under the FMLA, while the retaliation claim requires proof of [the employer's] retaliatory intent.'" *Sherif*, 127 F. Supp. 3d at 477 (quoting *Bosse v. Baltimore Cty*, 692 F. Supp. 2d 574, 588 (D. Md. 2010)). "To survive an employer's motion for summary judgment, a plaintiff must show direct evidence of discrimination, or establish a *prima facie* case that raises an inference of illegal conduct." *Sherif*, 127 F. Supp. 3d at 489 (citing *Coleman v. Maryland Court of Appeals*, 626 F.3d 178, 190 (4th Cir. 2010), *aff'd*, 566 U.S. 30 (2012)).

The *McDonnell Douglas* burden-shifting framework applies to plaintiff's FMLA retaliation claim, because FMLA retaliation claims are analogous to Title VII retaliation claims. *See, e.g. Yashenko*, 446 F.3d at 550-51; *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502 (4th Cir. 2001). By analogy to Title VII, to establish a prima facie case of retaliation, plaintiff must show "'that [s]he engaged in protected activity, that the employer took adverse action against [her], and that the adverse action was causally connected to the plaintiff's protected activity.'" *Yashenko*, 446 F.3d at 551 (quoting *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998)); *see Evans v. International Paper Co.*, ___ F.3d ___, 2019 WL 4018287, at *7 (4th Cir. August 27, 2019); *Irani*, 767 Fed. App'x at 421 (per curiam); *Strothers v. City of Laurel*, 895 F.3d

317, 327 (4th Cir. 2018); *Guessous*, 828 F.3d at 217; *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004). "If a plaintiff 'puts forth sufficient evidence to establish a prima facie case of retaliation' and a defendant 'offers a non-discriminatory explanation' for [the adverse action], the plaintiff 'bears the burden of establishing that the employer's proffered explanation is pretext.'" *Hoyle*, 650 F.3d at 337 (quoting *Yashenko*, 446 F.3d at 551).

A plaintiff must first establish that she engaged in protected activity. The Fourth Circuit has explained that, "in the context of a retaliation claim, a 'protected activity' may fall into two categories, opposition and participation." *Navy Federal Credit Union*, 424 F.3d at 406; *see Netter*, 908 F.3d at 937. "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse . . . action against an employee for opposing discriminatory practices in the workplace." *Laughlin*, 149 F.3d at 259; *see* 42 U.S.C. § 2000e-3(a).

The second element of the prima facie case is an "adverse action." In *Strothers*, 895 F.3d at 327, the Fourth Circuit explained that an "adverse *employment* action" is not the standard in a retaliation case. (Emphasis added.) In other words, the adverse action "need not be employment or workplace-related in order to sustain a retaliation claim." *Id.* In a retaliation claim, the standard for an adverse action is more lenient than for a substantive discrimination claim. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) ("*Burlington Northern*") ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment.").

In the retaliation context, an action is adverse if it might "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 68 (quotation marks and citations omitted); *see Hoyle*, 650 F.3d at 337. By analogy,

Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern*, 548 U.S. at 67; *see also Ray v. International Paper Co.*, 909 F.3d 661, 557 (4th Cir. 2018). Nonetheless, "[t]he anti-retaliation provision of Title VII does not protect against 'petty slights, minor annoyances, and simple lack of good manners.'" *Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 738 (D. Md. 2009) (quoting *Burlington Northern*, 548 U.S. at 68). Nor does "a personal conflict alone . . . constitute retaliation." *Spencer v. Virginia State Univ.*, 919 F.3d 199, 208 (4th Cir. 2019).

To establish causation, the employee must prove that the alleged retaliation "would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360; *see also Irani*, 767 Fed. App'x at 421; *Foster v. Univ. of Md. – E. Shore*, 87 F.3d 243, 252 (4th Cir. 2015). The plaintiff may proceed either by direct evidence "or by proving that any non-retaliatory justification for the firing was pretextual." *Netter*, 908 F.3d at 938; *see Foster*, 787 F.3d at 249.

To satisfy the third element—a causal connection between the protected activity and the adverse action—a plaintiff at trial must show that "the employer [took] the adverse employment action *because* the plaintiff engaged in a protected activity." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (emphasis in original). Pursuant to the Supreme Court's ruling in *Nassar*, 570 U.S. at 362, "a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."

Ordinarily, there must exist "some degree of temporal proximity to suggest a causal connection." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th

Cir. 2005). Therefore, a "'lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action'" often "'negates any inference that a causal connection exists between the two.'" *Id.* (citation omitted). Indeed, "a lapse of as little as two months between the protected activity and an adverse employment action is 'sufficiently long so as to weaken significantly the inference of causation.'" *Clarke v. DynCorp Int'l LLC*, 962 F. Supp. 2d 781, 790 (D. Md. 2013) (quoting *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003)); *see Price*, 380 F.3d at 213 (although period of nine to ten months between protected conduct and adverse action presented "a very close question," trier of fact could find causal connection where defendant declined to hire plaintiff "at the first available opportunity").

Nevertheless, mere temporal proximity is not necessarily enough to create a jury issue as to causation. "'Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'" *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (citation omitted) (affirming summary judgment where the "actions that led to [plaintiff's] probation and termination began before her protected activity, belying the conclusion that a reasonable factfinder might find that [defendant's] activity was motivated by [plaintiff's] complaints").

If plaintiff "'puts forth sufficient evidence to establish a prima facie case of retaliation'" and the employer "'offers a non-discriminatory explanation'" for the adverse action, plaintiff "'bears the burden of establishing that the employer's proffered explanation is pretext for FMLA retaliation.'" *Yashenko*, 446 F.3d at 551 (quoting *Nichols*, 251 F.3d at 502). To meet her burden, the plaintiff must then prove, by a preponderance of evidence, "that the [employer's] proffered reason was not the true reason for the employment decision," and that the plaintiff "has been the

victim of intentional discrimination." *Texas Dep't of Cmty. Affairs*, 450 U.S. at 256; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000); *St. Mary's Honor Ctr.*, 509 U.S. at 516-20; *Adams v. Trustees of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had to prove '*both that the reason was false, and that discrimination was the real reason.*'" (quoting *Jiminez*, 57 F.3d at 378) (emphasis in original).

The Board concedes that plaintiff has established a prima facie case of retaliation. ECF 64 at 32-33. But, it argues that it has met its burden to show a non-discriminatory explanation for its employment action. *Id.* And, defendant maintains that plaintiff has failed to meet her burden to establish that defendant's proffered explanation was a pretext for FMLA retaliation. *Id.*

For the same reasons outlined earlier in regard to counts Two and Three, the Court agrees that defendant has met its burden to provide non-discriminatory explanations for its termination of plaintiff's employment. *See* ECF 64-33 (Board Decision); ECF 74, Ex. 43, Hearing Tr. at 438-41 (plaintiff's testimony regarding social media post), *id.* at 365-66, 526 (plaintiff's testimony about advisory lesson plan); *id.* at 383, 454-61 (plaintiff's testimony about grading practices); *id.* at 427-31 (plaintiff's testimony about "hangover"); *id.* at 436 (plaintiff's testimony about students taking a "nap"); *see also* ECF 74, Ex. 32 (social media post). The remaining question is whether plaintiff has established that defendant's proffered explanations are a pretext for FMLA retaliation.

In her effort to establish pretext, plaintiff identifies Lisa Katz and Robin Szymanski as similarly situated individuals who received better treatment from defendant. ECF 1, ¶¶ 52-56; ECF 69 at 6, 9, 12 n.16, 28-31, 32 n.38; ECF 74, Ex. 35. Plaintiff identifies Katz in her Complaint. But, in her Cross Motion and Reply, plaintiff does not mention Katz or provide any evidence to support those allegations. *See* ECF 1, ¶¶ 52-56; ECF 69; ECF 86. As to Szymanski, plaintiff provides

"comparator data" of defendant's treatment of Szymanski in support of her Cross Motion. ECF 74, Ex. 35. Accordingly, the Court will analyze Szymanski, but not Katz, as a similarly situated comparator.

As noted, "If a plaintiff wishes to prove that a defendant's legitimate, non-discriminatory explanation is pretext by pointing to other employees who were treated differently, '[t]he similarity between comparators … must be clearly established in order to be meaningful.'" *Farrelly*, *supra*, 2011 WL 778583, at *7 (quoting *Lightner*, 545 F.3d at 265); *see Haynes*, 922 F.3d at 223-24; *Irani*, 767 Fed. App'x at 420. A sufficient showing would include evidence that the employees "dealt with the same supervisor, [were] subject to the same standards and … engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992); *accord Haynes*, 922 F.3d at 223-24; *Haywood v. Locke*, 387 Fed. App'x 355, 359 (4th Cir. 2010); *see also Popo v. Giant Foods LLC*, 675 F. Supp. 2d 583, 589 (D. Md. 2009).

To be sure, "a comparison between similar employees 'will never involve precisely the same set of work-related offenses . . . under the same set of circumstances.'" *Haynes*, 922 F.3d at 223 (citation omitted). But, at least in the Title VII context, it "is not [a] toothless" standard. *Spencer*, 919 F.3d at 207.

Plaintiff and Szymanski are not viable comparators. Plaintiff identifies Szymanski as a similarly situated teacher with a disability at SCHS, and alleges that Szymanski's disability of stress fractures in her legs was "a more acceptable form of disability to her Supervisors," because of its "tangibility." ECF 69 at 9 n.11.

Plaintiff's Exhibit 35, referred to as "Szymanski Comparator Data," provides details about Szymanski's experience with her disability as a Special Education teacher at SCHS. ECF 101-1.[14] In December 2014, Szymanski was diagnosed with stress fractures to both of her legs, and her doctor ordered her not to walk, stand for more than a few minutes, or bear weight beyond a few steps. *Id.* at 1. As a result, Szymanski emailed an "official request for accommodations" to Human Resources Specialist Marianne Snyder, detailing concerns with her then-current accommodations. *Id.* The majority of Exhibit 35 reflects an ongoing dialogue between Szymanski, Snyder, and several other supervisors at SCHS about Szymanski's accommodations. ECF 101-1.

Despite plaintiff's allegations that Szymanski "received excellent communications and accommodations related to her disability," the record reflects that Szymanski did not engage in the kind of problematic behavior for which plaintiff was terminated. *See* ECF 69 at 9; ECF 101-1. The record reflects one warning letter to Szymanski, on March 5, 2015, from Director of Human Resources Jimmie Saylor, discussing an incident in which Szymanski "violated [her] physician's directive" when the elevator stopped working and she pushed herself back to her office, and another incident when she went to SCHS over a weekend when the facilities were closed due to inclement weather, against the school's directive. *Id.* at 38-39. Saylor wrote to Szymanski, "Please understand that deviation from these directives could constitute insubordination and may result in disciplinary action." *Id.* at 39.

These missteps suggest that Szymanski was trying to do more work than she was supposed to do, and perhaps jeopardized her own health. Such conduct is not similar to the conduct of plaintiff that led to her discharge. Thus, plaintiff has not shown that she and Szymanski "engaged

---

[14] Plaintiff's Exhibit 35 was inadvertently omitted from plaintiff's exhibit binders. Pursuant to the Court's request of July 19, 2019, plaintiff submitted Exhibit 35 on July 29, 2019. *See* ECF 100; ECF 101; ECF 101-1.

in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *See Mitchell*, 964 F.2d at 583.

Plaintiff's conclusory allegations of discrimination are insufficient to support a finding that defendant's proffered reasons for plaintiff's termination were pretextual. *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 281 (4th Cir. 2000) ("'[A] plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action.'") (quoting *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir. 1989)); *see also Mungro v. Giant Food, Inc.*, 187 F. Supp. 2d 518, 523 (D. Md. 2002) (finding that plaintiff's claim could not survive summary judgment where he "offered no more than his disagreement with [defendant's] decision to fire him and his subjective belief that [it] was motivated by discrimination"). Accordingly, the Board is entitled to summary judgment with respect to Count Six.

## IV.    Conclusion

For the reasons set forth above, I shall grant in part and deny in part defendant's Motion, and I shall deny plaintiff's Cross-Motion. An Order follows, consistent with this Memorandum Opinion.

Dated:  September 17, 2019                    _____/s/_____
                                             Ellen L. Hollander
                                             United States District Judge